**FILED**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SEP 2 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**KELLY SOWELL**
**as parent and next friend of the minor child,**
**D.S.,**
**and**
**D.S., individually**
**1206 Eastern Ave. Apt. 301, N.E.**
**Washington, DC 20019**

       **Plaintiff**

       **v.**

:
:
:
:
:
:

Case: 1:07-cv-01659
Assigned To : Sullivan, Emmet G.
Assign. Date : 9/20/2007
Description: CIVIL RIGHTS-NON. EMPLOY.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA:**
**A Municipal Corporation**

       **Defendant.**

**Serve:**
**Linda Singer,**
**Attorney General**
**District of Columbia**
**441 4th Street, N.W.**
**Washington, DC 20001**

**and**

**Mayor Adrian Fenty**
**Office of the Secretary**
**1350 Pennsylvania Avenue, N.W.**
**Washington, DC 20004**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## COMPLAINT

## JURISDICTION

1.    Plaintiff brings this Complaint seeking relief from an adverse decision regarding the

provision of a free appropriate public education, pursuant to the Individuals with

Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C.§§ 1400 *et seq.* This Court

**RECEIVED**

SEP - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

has jurisdiction pursuant to 28 U.S.C.§§ 1331 and 1343; and pendant jurisdiction pursuant to 5 D.C.Mun. Regs.§§ 3000 *et seq.* Declaratory relief is authorized by 28 U.S.C.§§ 2201 and 2202.

2.     Plaintiff is the mother of the minor child, D.S., and they have resided in the District of Columbia during the time of the underlying administrative proceedings.

3.     Defendant is a municipal corporation. As one of its governmental functions, Defendant operates the District of Columbia Public Schools System ("DCPS"). DCPS is responsible for affording children with disabilities in the District of Columbia all rights pursuant to IDEIA.

## FACTS

4.     D.S. is a six (6) year old boy who began the 2006-2007 school year at DCPS's Benning Elementary School ("Benning ES"), after transferring from Fort Foote Elementary School in Prince George's County ("P.G. County"), Maryland. On December 12, 2005, the Multi Disciplinary Team ("MDT") at Fort Foote wrote an initial Individual Education Plan ("IEP") for D.S. as a child with the disability classification of Developmental Delay. The IEP called for five (5) hours of Classroom Instruction in Reading, five (5) hours of Classroom Instruction in Mathematics, and thirty (30) minutes of Speech/Language Therapy per week. A Behavior Plan was also included in this IEP.

5.     On April 28, 2006, Fort Foote revised that IEP, increasing D.S.'s services to include fifteen (15) hours per week of Classroom Instruction. This revised IEP maintained the thirty (30) minutes per week of Speech/Language Therapy, as well as the Behavior Plan.

6.     It became clear almost immediately upon the start of the 2006-2007 school year,

2

that Benning ES was not an appropriate placement for D.S.. The school contacted Ms. Sowell numerous times within the first month of school to tell her that they could not handle D.S.'s behavioral needs.

7.    On September 21, 2006, Ms. Sowell received a note, allegedly from Mr. Bobbit, the Principal of Benning ES, stating that D.S.'s behavior was so severe that he would not be allowed to attend a full day of school unless Ms. Sowell accompanied him.

8.    On September 22, 2006, Ms. Sowell went to Benning ES to discuss the note she had received. She met with Mr. Bobbit, who denied writing the note. She also met with Ms. Smith, D.S.'s Guidance Counselor. Ms. Smith told Ms. Sowell that the school was working on a behavior plan, and would like to meet on October 16, 2006, to review D.S.'s Maryland IEP and draft a DCPS IEP.

9.    On October 16, 2006 an MDT meeting was convened at Benning ES in order to change the PG County Public School IEP to a DCPS IEP. Despite the fact that the Speech Pathologist, Ms. Perkins, requested to increase the Speech/Language Therapy, DCPS would not increase any services until after completing new evaluations. The evaluations from Fort Foote, however, were still valid at this time. Ms. Sowell stated at this meeting that she felt her son needed more services, and also requested an Occupational Therapy ("OT") Evaluation. However, the only evaluations listed on the Student Evaluation Plan were a Psychological, an Educational, and a Speech/Language.

10.   On December 18, 2006, the MDT reconvened to review the new evaluations and revise D.S.'s IEP. The Comprehensive Psychological Report, dated November 10, 2006, stated that D.S. is a student with severe cognitive problems, as well as high levels of opposition,

3

non-compliance and physical aggression towards adults and peers. The evaluator noted

that D.S. had already been diagnosed with Oppositional Defiance Disorder. The report

recommended that D.S. receive services in a full time program which offers emotional

support.

11.     The Speech and Language Evaluation Report, dated November 20, 2006, concluded that

D.S. demonstrated a severe disorder in auditory comprehension and in expressive

communication. D.S. also demonstrated a moderate disorder in the areas of receptive and

expressive vocabulary, as well as speech production. The report recommended that D.S.

attend Speech/Language Therapy at least one hour per week.

12.     The Vineland Adaptive Behavior Scale, dated November 27, 2006, was not administered

to Ms. Sowell because the evaluator did not have the paperwork ready when they spoke

on the phone. Instead, the evaluator interviewed D.S.'s special education and general

education teachers, and his speech therapist. While the Vineland report indicated that

D.S.'s Adaptive Behavior Composite is a 63, which is in the low range of overall

functioning, Ms. Sowell stated at the MDT meeting that the Vineland was not accurate

with respect to D.S.'s daily living skills.

13.     After reviewing the evaluations, and hearing the observations of D.S.'s mother and

teachers, the team agreed that Benning ES was not an appropriate placement for D.S.,

because he requires a full-time program as a student with Mental Retardation (MR).

Specifically, the team decided that D.S. requires twenty-six (26) hours per week of

Specialized Instruction, one (1) hour per week of Speech/Language Therapy, as well as

thirty (30) minutes per week of Psychological Services. The team also discussed adding

4

the disability classification of Emotional Disturbance (ED) to D.S.'s IEP due to his behavioral problems. However, it was decided that given his young age, the ED classification should not yet be placed on the IEP. The team felt that these behaviors might improve if D.S. is in the appropriate educational setting with one-on-one support.

14. The MDT also had a discussion about the percent of time D.S. should be in Specialized Instruction and Related Services. Ms. Sowell explained that she felt that D.S. needed a 100% out of General Education Setting. It became apparent at the meeting that D.S. needs a lot of individualized attention, and that his frustrations are compounded when he interacts with higher-functioning peers. The members of the team from Benning ES, however, would only agree to 85% out of General Education. Their explanation was simply that DCPS did not have any programs that were 100% out of General Education. When counsel for the parent stated that the IEP should be written based on D.S.'s needs, not based on the available programs in DCPS, the DCPS team members still refused to change their position.

15. At the conclusion of the December 18 meeting, Ms. Matthews, Special Education Coordinator at Benning ES, assured Ms. Sowell that a placement packet would be sent to the DCPS placement specialist immediately and a placement meeting would be scheduled as soon as possible. She stated that the team was in full agreement that Benning ES is not an appropriate placement for D.S., and they would do everything they could to expedite D.S.'s placement in an appropriate program.

16. Counsel for the parent contacted the school several times since December 18, 2006, to inquire as to when a placement meeting would be held. By February 7, 2007, however,

5

the parent has not received an invitation to a placement meeting, and thus filed a due process complaint notice.

17.    After filing the due process complaint, DCPS proposed Drew Elementary School for D.S. The parent went to visit Drew E.S. and did not think that it was appropriate due to the varying ranges of disabilities within the classroom and the varying levels of functioning of the other students.

18.    The due process hearing initially convened on or around April 17, 2007 in front of Hearing Officer Frederick Woods. Although the parties spent the entire day in the hearing, the hearing officer continued the case to a later date. While the hearing had to be continued to finish the case, the parent did not waive her right to receive a decision within the time frame outlined in IDEIA.

19.    The first date for which the hearing office could schedule another hearing was more than 30 days later on May 22, 2007.

20.    On April 20, 2007, the parent filed a Motion for Preliminary Injunction with Judge Friedman in the United States District Court for the District of Columbia, in accordance with the *Blackman Jones* Consent Decree.

21.    On April 24, 2007, the court referred the matter to the Special Master.

22.    On May 1, 2007, the Special Master convened a meeting with the parties.

23.    On May 4, 2007, the Special Master filed her Report and Recommendations with the Court. The Special Master recommended that the parent's request for relief be granted and that DCPS fund placement for D.S. at the Children's Guild.

24.    Subsequent to the Special Master's Report and Recommendation the District Court held

6

the matter in abeyance until June 1, 2007, in order for the Due Process Hearing scheduled

for May 22, 2007, to go forward.

25. Despite the Special Master's recommendation that injunctive relief be granted and DCPS

be required to fund a private placement for the student, a second Due Process Hearing

was held on May 22, 2007. After arguments by both parties the matter was continued

until June 1, 2007.

26. After the taking of testimony of several witnesses the matter had to again be continued to

hear additional evidence on June 5, 2007.

27. On June 8, 2007, the Hearing Officer issued his decision and dismissed the parent's

complaint with prejudice. *See* HOD attached.

## COUNT I

28. Plaintiff repeats and realleges paragraphs 1 - 27.

29. Hearing Officer Woods at the April 17, 2007, Due Process Hearing, erred in failing to

grant parent's Motion for Directed Decision and for the conclusion(s) reached in failing

to grant said Motion. The parent's Motion was based on the fact that the defendant

refused to develop a full time, out of general education IEP during its December 18, 2006

meeting, not because D.S. did not qualify for the requested program but because DCPS

did not have any programs that were 100% out of General Education.

## COUNT II

30. Plaintiff repeats and realleges paragraphs 1 - 29.

31. Based on the evidence, the Hearing Officer erred when he concluded that Drew E.S.

could provide FAPE for the student. The evidence clearly showed that Drew did not

7

provide a 100% out of General Education program and was only offered because DCPS

had no program that was 100% out of general education, even though the student's needs

required a program 100% out of General Education.

## COUNT III

32.     Plaintiff repeats and realleges paragraphs 1 - 31.

33.     The Hearing Officer erred when he wrongly concluded that DCPS had developed an

appropriate IEP for the student.  The IEP was developed to meet the needs of DCPS in

that they had failed to develop a continuum of level of services calculated to meet the

needs of their students.  Instead they placed this student in a less than 100% out of

General Education program because they had no such program themselves and they were

unwilling to establish their own program or fund a private program for the student.

## COUNT IV

34.     Plaintiff repeats and realleges paragraphs 1 - 33.

35.     The Hearing Officer erred when he concluded that DCPS did not violate this student's

due process rights when it failed to hold a placement meeting prior to the initiation of a

Due Process Complaint.

## COUNT V

36.     Plaintiff repeats and realleges paragraphs 1 - 35.

37.     The Hearing Officer erred when he concluded that DCPS was not required to provide an

OT evaluation.

8

## COUNT VI

38.   Plaintiff repeats and realleges paragraphs 1 - 37.

39.   The Hearing Officer erred when he failed to find that DCPS had violated the student's
      due process rights and when he failed to find that DCPS had denied this student FAPE.


**WHEREFORE**, Plaintiff respectfully requests this Court to:

1.   Issue a judgment for Plaintiff and against Defendant on all aforementioned counts;

2.   Order that the June 8, 2007,  Hearing Officer's Decision be reversed, ordering
     DCPS to provide full funding, with transportation, to an appropriate full time
     special education placement, such as the Children's Guild, for the 2007-2008
     school year, with compensatory education services and evaluations as determined
     by a forthcoming IEP meeting.

3.   Order an award of attorneys fees and costs to Plaintiff; and

4.   Grant such other and further relief as the Court deems just and proper.


Respectfully submitted,

Paul S. Dalton, Esq.
D.C. Bar No. 439118
Dalton& Dalton, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
(703) 739-4300 (ph)
(703) 739-2323 (fax)

9

# District of Columbia Public Schools

## State Enforcement & Investigation Division
### Confidential

**FREDERICK E. WOODS**, Esq., Due Process Hearing Officer
Van Ness Elementary School
1150 5th Street, S.E.
Washington, D.C. 20003
Facsimile: (202) 442-5556

| | | |
|---|---|---|
| **In the Matter of** | ) | **IMPARTIAL** |
| | ) | **DUE PROCESS HEARING** |
| **Damarcus Sowell** | ) | |
| Date of Birth: 03/12/00 | ) | **THIRD** |
| | ) | **DECISION AND ORDER** |
| Petitioner, | ) | |
| | ) | Hearing Request: February 7, 2007 |
| vs. | ) | **Cont. Hearing Dates: June 1 & 4, 2007** |
| | ) | Held at: 825 North Capitol Street, N.E. |
| **The District of Columbia Public Schools,** | ) | Eighth Floor |
| **Home School: Benning Elem. School** | ) | Washington, D.C. 20002 |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Parent:

Kelly Sowell, Mother
4065 Minnesota Ave., N.E.
Apt. # 304
Washington, D.C. 20019

Counsel for the Parent/Student:

Paul S. Dalton, Esq.
Dalton, Dalton & Houston, P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, VA 22314

District of Columbia Public Schools:

Daniel McCall, Esq.
Attorney Advisor
Office of the General Counsel, DCPS
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002

## I.    JURISDICTION

The Due Process Hearing was convened and this Order written pursuant to Public Law 108-446, the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400 et seq.; 34 C.F.R. §§ 300 et seq.; 5 D.C.M.R. §§ 3000 et seq.; and Section 143 of the D.C. Appropriations Act, effective October 21, 1998.

## II.    DUE PROCESS RIGHTS

The parent through counsel waived a formal reading of the due process rights.

## III.    FIVE-DAY DISCLOSURES

Petitioner:   Admitted on 04/17/07, without objection, a disclosure letter filed on 04/10/07 that lists four witnesses and attached thirty-seven exhibits sequentially labeled and tabbed DS-01 through DS-37

Respondent:   Admitted on 06/01/07 and 04/17/07, without objection, disclosure letters filed on 05/15/07 and 04/09/07 that together lists forty-four witnesses and attached one exhibit labeled DCPS-01.

## IV.    STATEMENT OF THE CASE

D.S., born 03/12/00, age 7-years 3-months, is a student with a disability who, according to his 12/18/06 IEP, is receiving his special education services as a 1st grade, 85% out-of-general education, Mentally Retarded (MR) student at, the parent's IDEIA "stay-put placement," Benning Elementary School (Benning ES) in Washington, D.C. pending placement in an appropriate full-time MR program. (R. at DS-21, 22)

On February 7, 2007, Paul S. Dalton, parent's counsel filed a Due Process Hearing Request complaining that DCPS violated the Individuals with Disabilities Education Improvement Act (IDEIA), 20 U.S.C. §§ 1400 et seq. and denied D.S. a Free Appropriate Public Education (FAPE) by doing three (3)-things: (1) "failing to issue an appropriate Notice of Placement; (2) failing to schedule and perform an OT evaluation within a reasonable time following D.S.'s 10/16/06 MDT Meeting; and (3) failing to increase D.S.'s services at the 10/16/06 MDT/IEP Meeting." (R. at DS-25)

The DCPS Student Hearing Office scheduled the first Due Process Hearing for 11:00 a.m., Tuesday, April 17, 2007. That hearing convened; was not completed; and was continued three times by the parties' to their mutually selected and agreed to dates and times—9:30 a.m., Tuesday, May 22, 2007; 9:30 a.m., Friday, June 1, 2007; and 1:00 p.m., Tuesday, June 5, 2007. All hearings convened as scheduled at DCPS Headquarters, 825 North Capitol Street, N.E., 8th Floor, Washington, D.C. 20002, or at Van Ness Elementary School, 1150 5th Street, S.E., Washington, D.C. 20003.

Attorney Advisor Daniel McCall appeared in-person for DCPS. Attorney Paul S. Dalton appeared in-person representing D.S. who was not present; and his mother who was present at the first hearing but not present at the May 22nd hearing. No testimony was taken at either of the first two hearings for the reasons that follow.

# First Hearing: Tuesday, April 17, 2007

## PRELIMINARY MATTERS

Two (2)-preliminary matters consumed the time at the first hearing, to wit: (1) arguments for and against parent counsel's oral Motion for a Directed Decision as a matter of law based solely on the admitted exhibits and specified IDEIA provisions; and (2) a discussion to clarify the issues raised in the parent's 02/07/07 hearing request. (R. at Hr'g Tr.)

The parent based their Motion for Directed Decision on the admitted exhibits that state in summary and in pertinent part that "D.S. requires a placement out-of-general education in a full-time MR program." (R. at DS-22) On 02/27/07, twenty (20)-days after the hearing request was filed, DCPS issued its Prior Written to Action Notice proposing D.S.'s change-in-placement for the 2006-07 school year from Benning ES to Drew ES out-of-general-education. (R. at DS-28) Drew ES, however, according to parent's counsel is a part-time not a full-time special education program; and D.S. needs a full-time program. There were, however, no admitted exhibits that described the Drew ES MR program.

In opposition to the parent's argument is D.S.'s 12/18/06 initial eligibility IEP that calls for him to receive his special education services in an 85% out-of-general education program not in a full-time 100% out-of-general education program. (R. at DS-21) And there were no admitted exhibits that explain the Drew ES MR program to determine if it can meet his needs as his Least Restrictive Environment (LRE).

So because there is a factual dispute about the type of program D.S. needs and a factual dispute about whether Drew ES could meet those needs, combined with there being no testimony to consider to resolve that factual dispute, the parent's Motion for a Directed Decision was denied. But the motion can be raised again at the appropriate time during the due process hearing.

Next, the hearing officer engaged the parties in a discussion about the issues in the hearing request to determine if any of the three (3)-issues were moot, resolved, withdrawn or were all of them still at issue. The discussion of the first issue consumed a considerable amount of time—here is why. Parent's counsel framed that issue as follows:

"Whether DCPS denied [D.S.] a FAPE by failing to issue an appropriate Notice of Placement?" (R. at DS-25)

3

As framed, parent's counsel argued the issue challenged whether Drew ES was an appropriate placement. Furthermore, counsel argued, the parent did not challenge whether DCPS complied with the IDEIA legal sufficiency requirements governing the content of an appropriate LEA's Prior Written Notice of Action [Placement] (PWNOP).

DCPS argued to the contrary. It reasoned that the issue challenged whether DCPS complied with the IDEIA legal sufficiency requirements governing the content of an appropriate LEA's Prior Written Notice of Action [Placement] pursuant to 20 U.S.C. § 1415 (c)(1), Content of Prior Written Notice. Furthermore, DCPS argued, the parent did not and could not challenge the Drew ES placement because on 02/07/07, when the hearing request was filed, D.S.'s placement was at Benning ES pending placement in a full-time MR program. (R. at DS-21, 22) DCPS did not propose Drew ES until 02/27/07, twenty (20)-days after the hearing request was filed. And the parent stated no facts in the hearing request about why Drew ES is an inappropriate placement as required by the IDEIA pleading standards.

Despite enduring repeated threats by parent's counsel to appeal the hearing officer decision if the issue was not interpreted in the parent's favor, the hearing officer did find in the parent's favor based on the complaint merits—not the threats. But in fairness to DCPS, the hearing officer granted DCPS leave to prepare a defense to the issue as interpreted by the hearing officer since DCPS had prepared its case based on the claim their PWNOP was legally deficient.

In further support of the decision to grant leave to continue the case is the pleading requirements in the IDEIA. The IDEIA at 20 U.S.C. § 1415 (b)(7)(A)(ii)(III), "the Complaint shall include … a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem." The issue "failing to issue an appropriate Notice of Placement does appear on its face to challenge whether DCPS complied with the IDEIA legally sufficiency requirements governing the content of an appropriate LEA Prior Written Notice of Action [Placement] (PWNOP) pursuant to 20 U.S.C. § 1415 (c)(1), Content of Prior Written Notice. But there are no facts supporting that interpretation when reading the facts in the hearing request supporting the parent's claim. In fact, there is no discussion in the hearing request about the legal sufficiency of the PWNOP.

So the hearing officer found that the parent did not intend to challenge the legal sufficiency of the PWNOP. Instead, the hearing officer found facts in the fact section of the hearing request supporting the parent's claim that D.S. did not have an appropriate placement—the claim the parent was raising as the first issue in the hearing request.

That's because the Complaint fact section states, in pertinent part, that "the team [BLMDT/IEP Team] agreed that Benning ES is not an appropriate placement … and it would expedite placement in an appropriate program. As of the date of the Complaint, the parent has not received an invitation to a placement … so [D.S.] suffers in an inappropriate placement." (R. at DS-25) The hearing officer found that those facts gave DCPS reasonable notice that the parent had concerns about D.S.'s placement. And since

4

DCPS proposed Drew ES after the hearing request was filed, it should prepare to defend that placement since the parent was prepared to oppose it. Albeit the hearing request was not drafted as precise as it should be, the parties' agreed placement was at issue.

By the time that issue was clarified there was time remaining but not enough time in the scheduled hearing to take and complete all witness testimony. So the hearing officer discussed the need to continue the case. The hearing officer then asked the parent if she wanted to propose interim relief for D.S. in light of the continuance. Without consulting his client parent's counsel said "no." The hearing officer informed parent's counsel that he should take a few minutes to consult with his client since under the D.C. Rules of Professional Conduct that decision belonged to the parent. Counsel agreed so the hearing was recessed for that purpose.

When the hearing officer returned to the hearing room the parties' had already consulted with the DCPS SHO, without the hearing officer being present, and had agreed to May 22, 2007, as their new hearing date. Since the parties mutually agreed to and selected that date, the hearing officer did not inquire as to why that date was selected. Based on that sequence of events, the hearing officer went back on the hearing record, asked the parties if May 22, 2007, was an agreeable date to continue the hearing and counsel for each party said "yes." The hearing officer then asked the parent a second time if she sought interim relief in light of the continuance; and parent's counsel once again said "no." So the case was continued until 9:30 a.m., Tuesday, May 22, 2007.

## Second Hearing: Tuesday, May 22, 2007

## <u>PRELIMINARY MATTERS</u>

Once again two (2)-preliminary matters were raised at this hearing, to wit: (1) parent counsel's written 05/21/07 Petitioner's Motion to Stay the Due Process Hearing Pending the Outcome of Federal Litigation; and (2) parent counsel's oral Motion to Continue the Case because counsel was sick.

As to the Motion to Stay, DCPS' attorney advisor gave the hearing officer a copy of a district court Order that held in abeyance until June 1, 2007, D.S.'s federal litigation and allowed the parent's requested relief—a private placement—to be determined by the hearing office[r] so long as it was made within seven (7) calendar days of the May 22, 2007 hearing. After reviewing that court order, which parent's counsel said he had not received; parent's counsel withdrew his Motion to Stay the Due Process Hearing.

Next, the hearing officer heard arguments for and against parent counsel's oral Motion for a Continuance. DCPS objected to the continuance on the grounds that the last continuance granted, albeit mutually agreed to, became the subject of the pending federal litigation. And, DCPS counsel argued, the district court required compliance with its Order within specified time limits. In response, parent's counsel said that he was not feeling well; he could not go forward with the hearing; no substitute counsel from his law

firm could litigate the case; and that he was not available to convene again until the week of May 28, 2007.

The parties then called the law clerk of Paul L. Friedman, United States District Judge who issued the federal court Order, to ask if the ordered time limits could be extended in light of parent's counsel request for a continuance. The clerk recommended that the parties' file a joint motion with the court requesting relief from and an extension of his ordered time limits to complete the IDEIA due process hearing before resuming, if necessary, federal court litigation of this matter. The parties agreed to file the joint motion and provide the hearing officer a copy of their motion and the judge's order.

On May 23, 2007, the parties' provided the hearing officer a copy of their Joint Motion to Extend the Time Limit for the Hearing Officer's Decision. Although there was no signed order granting or denying the motion, the hearing officer granted the parent's requested relief and continued the case to the parties mutually agreed date of Friday, June 1, 2007, from 9:30 a.m. – 5:00 p.m.

Therefore, based on the hearing record, more time was needed to complete the testimony in this case. The hearing officer found that a specific extension of time to complete that testimony was warranted and granted the parent's requested relief to continue the case. **So the case was continued until Friday, June 1, 2007 from 9:30 a.m. until 5:00 p.m. where testimony was taken but not completed.**

## Third Hearing: Friday, June 1, 2007

Attorney Advisor Daniel McCall appeared in-person for DCPS. Attorney Paul S. Dalton appeared in-person representing D.S. who was not present; and his mother who was present. Testimony was taken but not completed. Here is why.

After completing the testimony of three (3)-witnesses for the parent's case-in-chief: (1) Kelly Sowell, the mother; (2) Ava Booker, Ed.D., Education Advocate; and (3) Lamar Williams, Children's Guild Director of Admissions; and the testimony of one DCPS witness: (1) Kristen M. Denning, DCPS School Psychologist there was not enough time to take and complete the testimony of the other DCPS witnesses. So the parties jointly agreed to continue the case to complete the testimony.

Therefore, based on the hearing record, more time was needed to complete the testimony in this case. And the hearing officer found that a specific extension of time to complete that testimony was warranted and granted the parties' requested relief to continue the case. **So the case was continued by the parties to their mutually selected and agreed to date and time of Tuesday, June 5, 2007 from 1:00 p.m. until 3:00 p.m.**

6

# Fourth Hearing: Tuesday, June 5, 2007

Attorney Advisor Daniel McCall appeared in-person for DCPS. Attorney Paul S. Dalton appeared in-person representing D.S. who was not present; and his mother who also was not present but authorized her attorney to proceed with the case. All remaining testimony was taken and completed.

## V.     SUMMARY OF THE EVIDENCE

The testimony of these seven (7)-listed witnesses and these twelve (12)-listed admitted exhibits are relied upon in reaching the decision.

### Witnesses:

(1) D.S.'s mother;
(2) Ava Booker, Ed.D. Education Advocate;
(3) Lamar Williams, Children's Guild Director of Admissions;
(4) Kristen M. Denning, DCPS School Psychologist;
(5) Rhoda Matthews, Benning ES Special Ed Coordinator;
(6) Jennifer Weber, Benning ES General Ed Teacher; and
(7) Denise Keeling, Drew ES Special Ed Coordinator.

### Exhibits:

| | | |
|---|---|---|
| 1. | DS-25 | The 02/07/07 Parent's Due Process Hearing Request |
| 2. | DS-05 | The 04/28/06 Maryland Public Schools IEP |
| 3. | DS-08 | The 10/16/06 Student Evaluation Plan |
| 4. | DS-09 | The 10/16/06 IEP & IBP |
| 5. | DS-10 | The 10/16/06 MDT Meeting Notes |
| 6. | DS-16 | The 11/10/06 DCPS Comprehensive Psychological Report |
| 7. | DS-21 | The 12/18/06 IEP & IBP |
| 8. | DS-22 | The 12/18/06 MDT Meeting Notes |
| 9. | DS-28 | The 02/27/07 Prior Written Notice of Placement |
| 10. | DS-30 | The 03/07/07 Counsel Ltr to Benning ES SEC Re Proposed Placement |
| 11. | DS-33 | The 03/26/07 Counsel Ltr to Benning ES SEC Rejecting the Proposed Placement at Drew ES |
| 12. | DS-35 | The 04/10/07 Acceptance Ltr from The Children's Guild in Chillum |

### Issue

**Did DCPS violate the Individuals with Disabilities Education Improvement Act (IDEIA) 20 U.S.C. §§ 1400 et seq., and deny D.S. a Free Appropriate**

7

Public Education (FAPE) for the 2006-07 school year by doing three things: (1) "failing to issue D.S. an appropriate Notice of Placement; (2) failing to schedule and perform an OT evaluation within a reasonable time following D.S.'s 10/16/06 MDT Meeting; and (3) failing to increase D.S.'s services at his 10/16/06 MDT Meeting." (R. at DS-25) And, if so, can parent's selected private placement provide D.S. educational benefit?

### Answer

No. DCPS made a FAPE available to the parent who rejected it.

## VI.    FINDINGS OF FACT

1.    D.S., born 03/12/00, age 7-years 3-months, is a student with a disability who, according to his 12/18/06 IEP, is receiving his special education services as a 1st grade, 85% out-of-general education, Mentally Retarded (MR) student at the parent's IDEIA "stay-put placement" Benning Elementary School (Benning ES) in Washington, D.C. pending placement in an appropriate full-time MR program. (R. at DS-21, 22)

2.    According to D.S.'s 12/18/06 IEP, signed by his mother evincing agreement with its content except for her handwritten note stating—"I don't agree with 85% ... D.S. needs 100% full time"—he receives these special education services as an MR student in his LRE setting 85% out-of-general education because he is significantly below grade level—

| | |
|---|---|
| Specialized Instruction | 26-hours/week, |
| Speech-Language Therapy | 1-hour/week, and |
| Psychological Services | 30-minutes/week. |
| (R. at DS-21) | |

3.    According to his 12/18/06 MDT Meeting Notes, "The parent and advocate disagreed with the [85%] time in special education with exposure to his non-disabled peers ... instead the parent wants a full time 100% program [with no exposure to his non-disabled peers]. [According to his MDT] "a full-time 100% program is not warranted at this time." No placement site, however, was proposed at that meeting. (R. at DS-22)

4.    A placement site was proposed on 02/27/07, according to D.S.'s Resolution Meeting Notes. DCPS offered Drew ES as the placement. By-phone, Ms. Keeling, Drew ES Special Ed Coordinator (SEC) participated in the Resolution Meeting and described the Drew ES MR-Primary Program to the MDT. The mother said "she wanted to visit the program first." DCPS issued the Notice of Placement to Drew ES at that meeting. (R. at DS-26, 28)

8

5.   According to parent counsel's 03/07/07 letter to the Benning ES SEC, the parent and her counsel visited Drew ES and "the parent has serious concerns about the placement. Specifically the varying functioning levels of other students and the class structure. A final decision will be made next week." (R. at DS-30)

6.   According to parent counsel's 03/26/07 letter to the Benning ES SEC, "the parent decided to reject the placement of Drew ES." No additional reasons were given for the rejection. (R. at DS-33)

7.   According to the credited testimony of the mother, who struggled at times to understand the questions asked but once she understood them gave unrehearsed answers—

   a.   She agreed with D.S.'s 12/18/06 IEP except for the amount of time he spends in the general education setting.

   b.   What she wants and means by a 100% program is for D.S. to be in a special education program where is has no contact with his non-disabled peers. That means no lunch, recess, or specials with general education students like he would have if he attends Drew ES.

   c.   And her other concerns about Drew ES are twofold:

      i.   Two students in the classroom proposed for D.S. at Drew ES have special needs that will take teacher time away from the time that teacher could address D.S.'s individual needs; and

      ii.  Based on the class structure D.S. would receive group not individualized instruction; and he may be distracted by in-class behavior problems like he was in his last placement.

8.   According to the testimony of Ava Booker, Ph.D., the student's educational advocate—albeit DCPS objects to the testimony on the grounds it was obtained, in part, in violation of D.C. Rule of Professional Conduct 4.2, Communication Between Lawyer and Opposing Parties, when at separate times she and an attorney from parent counsel's law firm visited Drew ES, a represented party, on or about 03/22/07 and 03/07/07 after the hearing request was filed on 02/07/07 without the consent of DCPS counsel—

   a.   D.S. needs a 100% out-of-general education special education program with only his disabled peers; and DCPS cannot offer him such a program so it developed an 85% program.

9

b. Drew ES cannot meet those needs because two students have needs that will take significant teacher time away from addressing D.S.'s individualized, one-to-one needs, and the teacher time needed to redirect D.S. when necessary.

c. D.S. needs a 100% self contained classroom, an intensive multi-sensory educational delivery system, safety and structure to accommodate his unique needs. And The Children's Guild in Chillum is such a placement setting.

d. Since 03/13/07, however, she has not obtained or reviewed any additional information about how D.S. is performing in school.

e. And Dr. Booker did not evaluate D.S.; never observed D.S. in his classroom; and never spoke to any of his teachers about him.

9.    According to the credited and unrebuted testimony of Kristen Myers Dennis, DCPS School Psychologist:

a. She is the School Psychologist for Benning ES, Payne ES, and Drew ES.

b. She performed D.S.'s Comprehensive Psychological Evaluation and wrote a report summarizing her findings and recommendations on 11/10/06. (R. at DS-16)

c. Her report Summary states that "[D.S.] should receive a full-time [special education] program that will address his needs." The report Recommendations are silent about the percentage of time D.S. should spend each week in a general education setting or the percentage of time he should spend in a special education setting. (R. at DS-16)

d. She said a full-time special education program means "all academic instruction in a special education classroom."

e. Drew ES can provide D.S.'s IEP called for academic instruction in a small special education classroom; can provide his related services; and provide him his LRE so he can continue to benefit socially from his non-disabled peers. Drew ES can provide him educational benefit.

f. D.S. would and does benefit from having lunch, recess and specials with his non-disabled peers to observe modeling of appropriate behaviors that he can emulate. And because D.S. is now in that kind of setting at Benning ES, he has made a 90% change in behavior.

g. Unlike the temper tantrums exhibited when he first arrived at school, he now plays cooperatively with his peers, does not throw things, is not acting out, gets on and off the school bus without incident, and is making social progress with the social supports he is receiving.

h. As an MR student, D.S. may become frustrated when he does not understand his academic challenges and that frustration causes his behavior issues. So being coded as MR concentrates on his academic needs first whereas if he was coded as ED the concentration would be on his behavior first.

10. According to the credited and unrebuted testimony of Rhoda Matthews, Benning ES Special Ed Coordinator (SEC)—

a. She has been the Benning ES SEC for three (3)-years.

b. She participated as a member of D.S.'s 12/18/06 MDT/IEPT Meeting; and his 02/27/07 MDT/IEPT/Placement Meeting.

c. At the placement meeting, Ms. Keeling described the Drew ES MR Program, answered the parent's questions about it, and the parent said she wanted to visit the program.

d. Since that meeting D.S. has stabilized behaviorally. He used to curse and fight daily. But now that conduct is drastically reduced because he socially benefited from interacting with his non-disabled peers.

11. According to the credited and unrebuted testimony of Jennifer Weber, Benning ES General Ed Teacher—

a. She is and has been D.S.'s teacher since October 2006.

b. D.S. has improved listening and social skills.

c. When he first enrolled at Benning ES this 2006-07 school year he threw a book at a student's head, turned over his desk, and threw a trash can at his teacher. Now he still cusses but no longer exhibits the aggressive behaviors exhibited when school started.

d. He is now a wonderful student, without aggression and little cussing.

e. He enjoys his specials—[art, music, and gym], recess, and lunch with his non-disabled peers so much that he asks for those specific time periods.

05 09 1997  11:39   1819999315F          STUDENT HEARINGS               PAGE  13 14

12.     According to the credited testimony of Denise Keeling, Drew ES SEC—

   a.  She has been the Drew ES SEC for two (2)-years.

   b.  Drew ES can implement D.S.'s 12/18/06 IEP. His proposed classroom has seven (7)-MD and/or MR disability coded children with a certified teacher and one full-time aide.

   c.  The MR Primary Program is located on the first floor of the school along with the headstart and pre K students. D.S. would have lunch, recess, and specials there with his non-disabled peers.

   d.  The specialized instruction and related services called for in his 12/18/06 IEP can be provided at Drew ES.

13.     The parent provided no testimony on two of her three issues: (1) whether DCPS failed to perform an OT Evaluation; and (2) whether DCPS failed to increase D.S.'s services at his 10/16/06 MDT Meeting.

14.     D.S.'s 10/16/06 MDT Meeting Notes state "I [the parent] do not believe these are all the hours and services [D.S.] needs." But neither the meeting notes nor the mother's due process hearing testimony say what increased services the mother wanted on 10/16/06 and why. (R. at DS-10)

15.     As to an OT Evaluation, the meeting notes state "the mother requested and OT Evaluation;" however, D.S.'s 10/16/06 Student Evaluation Plan (SEP) does not recommend an OT Evaluation. (R. at DS-08)

16.     There is no other evidence about why the student needs an OT Evaluation.

17.     So based on the record evidence, D.S.'s 12/18/06 IEP is appropriate; DCPS proposed an appropriate placement to implement it; there is no evidence why the student needs an OT Evaluation; and there is no evidence about what increased services the parent wanted on 10/16/06.

So in consideration of the record evidence, the hearing officer makes the following—

## VIII.  DISCUSSION and CONCLUSIONS OF LAW:
### I
DCPS is required to make a FAPE available to all children with disabilities within the jurisdiction of the District of Columbia.

The IDEIA at 20 U.S.C. § 1400 et seq. and 5 D.C.M.R. § 3000.1 (2003) requires DCPS to fully evaluate every child suspected of having a disability within the jurisdiction of the District of Columbia, ages 3 through 22, determine their eligibility for special education and related services and, if eligible, provide special education and related services through an appropriate IEP and Placement.

DCPS met its legal obligation under the IDEIA. Here is why.

1. Pursuant to 20 U.S.C. § 1414 (d)(1)(A)(i)(II)(aa), (bb), Individualized Education Programs or IEP "means a written statement for each child with a disability that includes a statement of measurable annual goals, including academic and functional goals, designed to—

   aa. Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

   bb. Meet each of the child's other educational needs that results from the child's disability."

2. Pursuant to 20 U.S.C. § 1414 (d)(2)(A), Requirement that program be in effect, "At the beginning of each school year, each local educational agency … shall have in effect an IEP as defined by [20 U.S.C. § 1414 (d)] (1)(A)."

3. DCPS complied, in part, with these cited IDEIA obligations because the student's 12/18/06 IEP was developed with the participation of and agreement to it by his mother for implementation for the 2006-07 school year after D.S. enrolled at Benning ES with his IEP developed by a State of Maryland Public School. DCPS however, did not issue its Prior Written Notice of Placement to implement that IEP until 02/27/07. (R. at DS-21, 28)

4. Pursuant to 5 D.C.M.R. § 3013.1(e), Placement, "[t]he LEA shall ensure that the educational placement decision for a child with a disability is … based on the child's IEP."

5. Pursuant to 5 D.C.M.R. § 3025, Procedural Safeguards—Prior Written Notice, DCPS shall provide written notice to the parent of a child with a disability before it proposes … an educational placement of the child.

6. Pursuant to 34 C.F.R. § 300.17, Free Appropriate Public Education (FAPE), means "special education and related services provided at public expense; meet[ing] the standards of the SEA; [at] an appropriate pre-school, elementary school, or secondary school; and provided in conformity with an individualized education program (IEP)."

7. Pursuant to 34 C.F.R. § 300.327, Educational Placements, "[e]ach public agency must ensure that the parents of each child with a disability are members of any group that makes decisions on the education placement of their child."

8. Pursuant to 5 D.C.M.R. § 3025, Procedural Safeguards—Prior Written Notice, DCPS shall provide written notice to the parent of a child with a disability before it proposes...an educational placement of the child.

9. Pursuant to 34 C.F.R. §§ 300.503(a)-(b), Prior Notice by the Public Agency, "written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency proposes to change ... the educational placement."

10. DCPS complied with these IDEIA obligations because Drew ES is an appropriate placement to implement D.S.'s 12/18/06 IEP. Here is why.

11. D.S.'s 12/18/06 IEP, signed by his mother evincing agreement with its content except for her handwritten note stating—"I don't agree with 85% ... D.S. needs 100% full time"—he receives these special education services as an MR student in his LRE setting 85% out-of-general education because he is significantly below grade level—

| | |
|---|---|
| Specialized Instruction | 26-hours/week, |
| Speech-Language Therapy | 1-hour/week, and |
| Psychological Services | 30-minutes/week. |
| (R. at DS-21) | |

12. According to his 12/18/06 MDT Meeting Notes, "The parent and advocate disagreed with the [85%] time in special education with exposure to his non-disabled peers ... instead the parent wants a full time 100% program [with no exposure to his non-disabled peers]. [According to his MDT] "a full-time 100% program is not warranted at this time." No placement site, however, was proposed at that meeting. (R. at DS-22)

13. A placement site was proposed, however, on 02/27/07, according to D.S.'s Resolution Meeting Notes. DCPS offered Drew ES as the placement. By-phone, Ms. Keeling, Drew ES Special Ed Coordinator (SEC) participated in the Resolution Meeting and described the Drew ES MR-Primary Program to the MDT. The mother said "she wanted to visit the program first." DCPS issued the Notice of Placement to Drew ES at that meeting. (R. at DS-26, 28)

14. According to the credited testimony of the mother, who struggled at times to understand the questions asked but once she understood them gave unrehearsed answers—

    a  She agreed with D.S.'s 12 18 06 IEP except for the amount of time he spends in the general education setting.

    b.  What she wants and means by a 100% program is for D.S. to be in a special education program where is has no contact with his non-disabled peers. That means no lunch, recess, or specials with general education students like he would have if he attends Drew ES.

    c.  And her other concerns about Drew ES are twofold:

        (I.)  Two students in the classroom proposed for D.S. at Drew ES have special needs that will take teacher time away from the time that teacher could address D.S.'s individual needs; and

        (II.)  Based on the class structure D.S. would receive group not individualized instruction; and he may be distracted by in-class behavior problems like he was in his last placement.

15. However, only the mother and her advocate, an advocate who never observed D.S. in his classroom, believes this seven year old first grader needs to be in the most restrictive special educational setting—a 100% full-time placement setting with no opportunity to interact with his non-disabled peers.

16. But the evidence to the contrary is overwhelming from people who know, taught and observed D.S. in his classroom. Here is what they said.

17. According to the credited and unrebuted testimony of Kristen Myers Dennis, DCPS School Psychologist:

    a.  She is the School Psychologist for Benning ES, Payne ES, and Drew ES.

    b.  She performed D.S.'s Comprehensive Psychological Evaluation and wrote a report summarizing her findings and recommendations on 11/10/06. (R. at DS-16)

    c.  Her report Summary states that "[D.S.] should receive a full-time [special education] program that will address his needs." The report Recommendations are silent about the percentage of time D.S. should spend each week in a general education setting or the percentage of time he should spend in a special education setting. (R. at DS-16)

    d.  She said a full-time special education program means "all academic instruction in a special education classroom."

e. Drew ES can provide D.S.'s IEP called for academic instruction in a small special education classroom; can provide his related services; and provide him his LRE so he can continue to benefit socially from his non-disabled peers. Drew ES can provide him educational benefit.

f. D.S. would and does benefit from having lunch, recess and specials with his non-disabled peers to observe modeling of appropriate behaviors that he can emulate. And because D.S. is now in that kind of setting at Benning ES, he has made a 90% change in behavior.

g. Unlike the temper tantrums exhibited when he first arrived at school, he now plays cooperatively with his peers, does not throw things, is not acting out, gets on and off the school bus without incident, and is making social progress with the social supports he is receiving.

18. According to the credited and unrebuted testimony of Rhoda Matthews, Benning ES Special Ed Coordinator (SEC)—

a. She has been the Benning ES SEC for three (3)-years.

b. She participated as a member of D.S.'s 12/18/06 MDT/IEPT Meeting; and his 02/27/07 MDT/IEPT/Placement Meeting.

c. At the placement meeting, Ms. Keeling described the Drew ES MR Program, answered the parent's questions about it, and the parent said she wanted to visit the program.

d. Since that meeting D.S. has stabilized behaviorally. He used to curse and fight daily. But now that conduct is drastically reduced because he socially benefits from interacting with his non-disabled peers.

19. According to the credited and unrebuted testimony of Jennifer Weber, Benning ES General Ed Teacher—

a. She is and has been D.S.'s teacher since October 2006.

b. D.S. has improved listening and social skills.

c. When he first enrolled at Benning ES the start of the 2006-07 school year he threw a book at a student's head, turned over his desk, and threw a trash can at his teacher. Now he still cusses but no longer exhibits the aggressive behaviors exhibited when school started.

d. He is now a wonderful student, without aggression and little cussing.

16

e. He enjoys his specials, recess, and lunch with his non-disabled peers so much that he asks for those specific time periods.

18. This hearing officer is persuaded by those who know and service D.S. at school who all agree he needs his special education services out-of-general education in a self-contained classroom due to his low academic functional levels. And they also all agree he needs and benefits from behavior modeling when interacting with his non-disabled peers. In fact, he enjoys those interactions so much; his teacher said that he now asks for those opportunities. And although his behavior is not perfect, the consensus is it has improved.

19. On 02/27/07, DCPS issued a Prior to Action Notice for Change in Placement that changed D.S.'s placement from Benning ES to Drew ES because "[D.S.] requires an out-of-general education setting in order to access the general education curriculum." (R. at DS-28) Drew ES is his LRE because it allows D.S. to interact on limited basis with his non-disabled peers.

20. Moreover, the parent offered no persuasive evidence that D.S. could not benefit at such a young age from appropriate behavior modeling by interacting with his non-disabled peers.

21. Nor did the parent offer any persuasive evidence that his IEP could not be implemented at Drew ES. And her concerns about how the teacher in the Drew ES MR Primary Program may spend his class time based on the needs of two other student's in the class is an important but not dispositive consideration in deciding if Drew ES could implement the IEP. Here is why.

22. In contrast to the mother's testimony that Drew ES could not provide D.S. the specialized instruction, counseling and speech-language therapy called for in his 12/18/06 IEP, the credited testimony of the Drew ES SEC says otherwise.

23. That's because according to the SEC's testimony—

a. She has been the Drew ES SEC for two (2)-years.

b. Drew ES and implement D.S.'s 12/18/06 IEP. His proposed class room has seven (7)-MD and/or MR disability coded children with a teacher and one full-time aide.

c. The MR Primary Program is located on the first floor of the school along with the headstart and pre K students. D.S. would have lunch, recess, and specials there with his non-disabled peers.

d. The specialized instruction and related services called for in his 12/18/06 IEP can be provided at Drew ES.

17

24. Despite that testimony, however, the parent insisted Drew ES is an inappropriate placement which suggests the parent would rather D.S. attend a private school even if Drew ES could meet his needs. D.S. can, however, attend the parent's selected private school if that's what his parent desires but not at public expense pursuant to the IDEIA and applicable case law interpreting it. Here is why.

25. According to the law, the IEP is developed by a team of professionals, including the child's parents, "as well as a representative of the local educational agency with knowledge about the school's resources and curriculum." Branham v. District of Columbia, 427 F.3d 7, 8 (D.C. Cir. 2005). An appropriate IEP, at a minimum, "must provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Board of Educ. v. Rowley, 458 U.S. 176, 204 (1982). That was done in this case on 12/18/06. (R. at DS-21)

26. And the IEP can not be implemented without first identifying a placement because the provision of the IEP services, which must be based upon the child's IEP pursuant to 34 C.F.R. § 300.116(b)(2), with consideration given to the quality of services that the child needs. 34 C.F.R. § 300.116(b)(2)(d).

27. DCPS did exactly what the IDEIA required it to do. DCPS participated on 12/18/06 in the development of an appropriate IEP for the student, and based on it and his unique needs proposed an appropriate placement to implement it. Albeit the parent disagrees with the proposed placement that alone is not enough to find the placement inappropriate.

28. Because under the IDEA the parent is a statutorily required participant in a group discussion about placement and a group placement decision. The parent, however, is only a member of the BLMDT/IEPT and not the final arbiter of the placement decision. No such power is granted the parent under the IDEA. Recent case law makes that point clear.

29. "Although the IDEA guarantees a Free Appropriate Public Education, it does not, however, provide that this education will be designed according to the parent's desires. The primary responsibility for formulating the education to be accorded a [child with a disability] and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parent or guardian of the child. Thus proof alone that loving parents can draft a better program than a state offers does not, alone, entitle them to prevail under the Act." Shaw v. The District of Columbia, 238 F. Supp. 2d 127, 139 (D.D.C. 2002).

30. Finally, the parent said that DCPS failed to perform D.S.'s OT Evaluation and failed to increase his services at his 10/16/06 MDT/IEPT Meeting. But there is no credible evidence in the hearing record to support those allegations. Moreover, even if those allegations were true, that would be a procedural violation of the IDEIA that did not result in a denial of a FAPE to D.S. Here is why.

31. Pursuant to the IDEIA at 20 U.S.C. § 1414 (E) (ii), and 34 C.F.R. § 300.513 (a) Decision of hearing officer on procedural issues, states that, "[i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education [FAPE] only if the procedural inadequacies—

      (I)     impeded the child's right to a free appropriate public education;

      (II)    significantly impeded the parent's opportunity to participate in the decision making process regarding the provisions of a FAPE to the parent's child; or

      (III)   caused a deprivation of educational benefits."

32. And pursuant to 34 C.F.R. § 300.513 (3) Hearing Decisions, "[n]othing in paragraph (a) of this section shall be construed to preclude a hearing officer from ordering an LEA to comply with procedural requirements."

33. D.S. was not denied a FAPE because the alleged procedural inadequacy, a failure to timely perform an OT Evaluation and a failure to increase unspecified services, is not supported by the evidence; and even if true, it did not impede D.S.'s right to a FAPE nor deprive him of educational benefit because he remains at his current parentally selected "stay put" placement receiving all of his 12/18/06 IEP called for special education services for the entire 2006-07 school year.

34. And since D.S.'s mother and attorney/advocate participated in the 02/27/07 and 12/18/06 BLMDT/IEPT/Placement Meetings where the IEP was developed and agreed to, and placement was discussed; and since D.S.'s PWNOP was issued, the parent's right to participate in the decision making process regarding the provisions of a FAPE was not impeded.

35. Moreover, according to the mother's own testimony she did not say or prove that her alleged procedural violation either impeded D.S.'s right to a FAPE or deprived him of educational benefit.

36. Consequently, based on the testimony of Ms. Mathews which is supported by the 02/27/07 BLMDT IEPT Placement Meeting Notes, there was a placement meeting; the parents and their attorney/advocate participated in the placement discussion. DCPS proposed an appropriate placement; the placement was later rejected by the parent and their attorney/advocate; and DCPS issued a PWNOP to its proposed placement—hence offered a FAPE. (R. at DS-26, 28, 30, 31, 33)

37. So there is no procedural violation of the IDEIA. But even if there was a procedural violation, it did not result in DCPS denying D.S. a FAPE.

38. Pursuant to 5 D.C.M.R. § 3030.3, "The burden of proof shall be the responsibility of the party seeking relief; either the parent/guardian of the child or the LEA. Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student a Free Appropriate Public Education (FAPE)."

39. The parent, who filed the hearing request, had and did not meet their burden of proof in this case because the parent:

   a. Failed to prove that Drew ES is an inappropriate placement to implement the student's 12/18/06 IEP; and

   b. Failed to prove why that the student needs an OT Evaluation;

   c. Failed to prove that D.S. was denied a FAPE when DCPS failed to increase his services at his 10/16/06 MDT/IEPT Meeting because there is no evidence regarding what increased services the parent sought nor how not providing them harmed the student; and

   d. Failed to prove the alleged procedural violations caused educational harm to the student resulting in a denial of a FAPE when the student has been attending the parent's selected "stay put" placement since that 02/27/07 PWNOP was issued.

Therefore, in consideration of the record evidence, the hearing officer finds that DCPS did not deny D.S. a FAPE and issues this:

# ORDER

1. The parent's 02/07/07 Due Process Hearing Request is dismissed, with prejudice.

20

2. The 45-day time limit, from filing the Due Process Hearing Request to its Disposition after the expiration of the 30-day period under § 300.510 (b) — receipt of the final Hearing Officer's Decision (HOD) pursuant 34 C.F.R. § 300.515 (a) (1)—is waived by the parent; and the time for disposition is extended, in accord with this Order, to accommodate the continuances.

3. There is no finding that DCPS denied D.S. a Free Appropriate Public Education (FAPE).

4. And the hearing officer made no additional findings.

This is the **FINAL ADMINISTRATIVE DECISION. An Appeal can be made to a court of competent jurisdiction within ninety (90)-days of this Order's issue date pursuant to 20 U.S.C. § 1415 (i)(1)(A), (i)(2)(B).**

_____          6/7/07
Frederick E. Woods                          _____
Hearing Officer                               Date

Issued: ___6/8/07___
DCPS Student Hearing Office

21

# District of Columbia Public Schools
### State Enforcement & Investigation Division

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| D.S. | ) |
|        Petitioner, | )     **IMPARTIAL** |
|        vs. | )   **DUE PROCESS HEARING** |
| | ) |
| **District of Columbia Public Schools,** | ) |
| **Drew Elementary School** | ) |
|        Respondent. | ) |

The Individuals with Disabilities Education Improvement Act (IDEIA) 20 U.S.C. §§ 1400 et seq.

**Case Information:**

Hearing Request Date: February 7, 2007
**Continued Hearing Dates: June 1 & 4, 2007**
Held at:  Van Ness Elementary School
        1150 5th Street, S.E.
        Washington, D.C. 20003
SETS Case Number: _____
Student's Birth Date: March 12, 2000
Attending School: Benning Elementary School
Managing School: Drew Elementary School

## CERTIFICATION OF RECORD

    I, Frederick E. Woods, Impartial Due Process Hearing Officer in this matter, do hereby certify that the attached Record of Proceedings and Index of Exhibits itemizes the entire record in the above captioned matter as of this date, consisting of all letters, pleadings, orders, exhibits, depositions, and tapes.

    I further certify that the materials placed in the SHO file for this student are either the original or true copy of the original documents submitted in this matter.

    Executed this 7th day of June, 2007.

                                Fred E. Woods
                       Due Process Hearing Officer

Re: MATTER OF
<u>D.S. v. DCPS, DREW ELEMENTARY SCHOOL</u>

# <u>RECORD OF PROCEEDINGS</u>

## <u>DATE:</u>              ## <u>DESCRIPTION:</u>

| DATE | DESCRIPTION |
|---|---|
| 02/07/07 | Due Process Hearing Request Filed By Parents |
| 03/27/07 | Notice of Due Process Hearing Date Sent to Parties |
| 04/17/07 | Due Process Hearing Convened; not Completed; Recorded in HR-3, Start Time 11:00 a.m. and End Time 4:00 p.m.; and Continued until May 22 2007. |
| 04/19/07 | Hearing Officer's Decision Filed with the SHO |
| 04/19/07 | Hearing Officer's Decision Issued by the SHO |
| 05/22/07 | Due Process Hearing Convened; Not Completed; Recorded in HR-2, Start Time 9:30 a.m. and End Time 11:15 a.m.; and Continued until June 1, 2007. |
| 05/23/07 | Hearing Officer's Decision Filed with the SHO |
| 05/23/07 | Hearing Officer's Decision Issued by the SHO |
| 06/01/07 | Due Process Hearing Convened; Not Completed; Recorded in HR-6(A), Start Time 9:30 a.m. and End Time 6:30 p.m.; and Continued until June 5, 2007. |
| 06/05/07 | Due Process Hearing Convened; Completed; Recorded in HR-7(A), Start Time 1:00 p.m. - End Time 3:00 p.m. |
| 06/07/07 | Hearing Officer's Decision Filed with the SHO |
| 06/07/07 | Hearing Officer's Decision Issued by the SHO |

Frederick E. Woods                    6/7/07
Due Process Hearing Officer                Date

23

07-1659
EGS

JS-44
(Rev.1/05-DC)

# CIVIL COVER SHEET

| I.(a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KELLY SOWELL, D.S., minor child | GOVERNMENT OF THE DISTRICT OF COLUMBIA |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** D.C.
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Paul S. Dalton, Esq.
Dalton & Dalton, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
(703) 739-4300 (ph)

Case: 1:07-cv-01659
Assigned To : Sullivan, Emmet G.
Assign. Date : 9/20/2007
Description: CIVIL RIGHTS-NON. EMPLOY.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)
**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)      OR      ○ F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

○

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ● **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Appeal from an adverse administrative decision pursuant to 20 USC Sec 1400 et seq

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ Check YES only if demanded in complaint<br>JURY DEMAND:   YES ☐   NO ☒ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE _9-6-07_   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.